IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

KAREEM MURRAY,

                   Petitioner,

      vs.

JOSEPH H. NOETH, Superintendent,
Attica Correctional Facility,[1]

             Respondent.

No. 9:19-cv-00224-JKS

MEMORANDUM DECISION

      Kareem Murray, a New York state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Murray is in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and incarcerated at Attica Correctional Facility.  Respondent has answered the Petition, and Murray has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

      Murray was charged in a six-count indictment with the second degree murder of Sylvester Scott after he and his uncle, Russell Palmer, fired weapons from a moving car at Scott, whom Murray believed had sexually assaulted his girlfriend.  The indictment also charged Murray with second-degree conspiracy, two counts of second-degree criminal possession of a weapon, second-degree criminal possession of a controlled substance, and third-degree criminal possession of a controlled substance.  On direct appeal of his conviction, the Appellate Division

---

[1]     Joseph H. Noeth, Superintendent, Attica Correctional Facility, is substituted for Donald Uhler, Superintendent, Clinton Correctional Facility.  FED. R. CIV. P. 25(c).

of the New York Supreme Court recounted the following facts underlying the charges against
Murray:

> As [Murray] and the codefendant, his uncle, were being investigated through
> eavesdropping warrants and surveillance for drug-related crimes, law enforcement
> officials learned that [Murray] was targeting an individual who [Murray] believed was
> involved in the rape of his girlfriend.  After the victim was shot and killed, [Murray] and
> [Palmer] were detained in a traffic stop and subsequently arrested.  A search of
> [Palmer's] vehicle revealed loaded handguns, ammunition and narcotics.  [Murray]  was
> charged in a multicount indictment in connection with the shooting of the victim, as well
> as his possession of the handguns and controlled substances.

*People v. Murray*, 64 N.Y.S.3d 158, 160 (N.Y. App. Div. 2017).

Murray moved to suppress statements Palmer made upon their arrest and anything
recovered from the vehicle, and the county court held a *Huntley*[2]/*Dunaway*[3]/*Mapp*[4] hearing to
determine the admissibility of the challenged evidence.  Following the hearing, the county court
held that Murray lacked standing to challenge the search of Palmer's car and that the search was
lawful as to Palmer.

Shortly before his trial was scheduled to begin, Murray sought to sever his trial from
Palmer's, arguing that Palmer had made an "extensive statement to police" that was harmful to
Murray, that Palmer and Murray had antagonistic defenses, and that Palmer's prior convictions

---

[2]     *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965) (a shorthand reference to the
hearing held in New York on a challenge to the admissibility of statements made to law
enforcement personnel).

[3]     A *Dunaway* hearing is used "to determine whether a statement or other intangible
evidence obtained from a person arrested without probable cause should be suppressed at a
subsequent trial."  *Montgomery v. Wood*, 727 F. Supp. 2d 171, 185-85 (W.D.N.Y. 2010); *see
Dunaway v. New York*, 442 U.S. 200 (1979).

[4]     *Mapp v. Ohio*, 367 U.S. 643 (1961) (a short-hand reference to excluding evidence
obtained as a result of an unconstitutional search and seizure).

would create a "chilling effect" on Murray's right to testify.  The county court denied severance by written, unpublished opinion.

Following a joint trial, Murray was convicted of second-degree murder, second-degree conspiracy, two counts of second-degree criminal possession of a weapon, and second-degree criminal possession of a controlled substance.  The trial court subsequently sentenced him to an indeterminate term of 25 years to life imprisonment for murder, with concurrent lesser prison terms for conspiracy and weapon possession, and a consecutive determinate 14-year imprisonment term for possessing a controlled substance.

Through counsel, Murray appealed his conviction, arguing that: 1) the trial court abused its discretion by denying Murray's severance motion; 2) the admission of Palmer's recorded police interview at their joint trial violated Murray's right to confront witnesses in violation of *Bruton*;[5] 3) the trial court erred in allowing the prosecution to challenge under *Batson*[6] Murray's attempt to strike two jurors, and those jurors were improperly allowed to serve on the jury panel; 4) the trial court erred in permitting the prosecution to admit evidence of a prior shooting incident; 5) evidence procured from the eavesdropping warrant should have been suppressed because there was insufficient probable cause for the warrant to have been issued; 6) the county court erred in determining that Murray did not have standing to contest the search of his uncle's vehicle; and 7) his determinate sentence of 14 years, which was ordered to run consecutively to

---

[5]     *Bruton v. United States*, 391 U.S. 123 (1968) (holding that the admission of a confession implicating a co-defendant in joint trial constituted prejudicial error even under circumstances in which trial court gave clear jury instruction that the confession could only be used against confessing defendant and must be disregarded with respect to the co-defendant).

[6]     *Batson v. Kentucky*, 476 U.S. 79, 96-98 (1986) (setting forth a three-part test that trial courts are to employ in evaluating the allegations of race-based exercise of peremptory challenges).

the other sentences, was harsh and excessive.  The Appellate Division unanimously affirmed the

judgment against Murray in a reasoned opinion issued on November 2, 2017.  *Murray*, 64

N.Y.S.3d at 163.  Murray filed a counseled application for leave to appeal in the New York

Court of Appeals, which was denied without comment on April 10, 2018.  *People v. Murray*, 102

N.E.3d 1066, 1066 (N.Y. 2018).

Murray then timely filed the instant *pro se* Petition for a Writ of Habeas Corpus to this

Court on February 12, 2019.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).  Briefing

is now complete, and the Petition is before the undersigned judge for adjudication.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Murray argues that: 1) the county court erred in

denying his severance motion; 2) the introduction of Palmer's recorded police interview violated

Murray's constitutional rights; 3) the trial court erred in allowing the prosecution to challenge

Murray's attempt to strike two jurors; and 4) the prosecutor committed misconduct by making

improper remarks on summation.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues de novo on the record before it.

*See Dolphy v. Mantello*, 552 F.3d 236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)); *cf. Wiggins v. Smith*, 539 U.S. 510, 530-31 (2003) (applying a de novo standard to a federal claim not reached by the state court). In so doing, the Court presumes that the state court decided the claim on the merits and the decision rested on federal grounds. *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (explaining the *Harris-Coleman* interplay); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 810-11 (2d Cir. 2000) (same). This Court gives the presumed decision of the state court the same AEDPA deference that it would give a reasoned decision of the state court. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference); *Jimenez*, 458 F.3d at 145-46. Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Ground 1.    <u>Erroneous Denial of the Severance Motion</u>

Murray first argues that the trial court erred in consolidating his case with the case of co-defendant Palmer. The Appellate Division disagreed on direct appeal, reasoning:

> Regarding [Murray's] motion for a separate trial, we find no abuse of discretion in County Court's denial of such motion. Upon a showing of good cause, a court may order separate trials. "[S]everance is compelled where the core of each defense is in irreconcilable conflict with the other and where there is a significant danger, as both defenses are portrayed to the trial court, that the conflict alone would lead the jury to infer defendant's guilt." [Murray] relies on the statements made in the redacted video interview of [Palmer] as a basis for severance but, as discussed, such statements did not implicate [Murray]. Furthermore, contrary to [Murray's] claim, [Palmer's] counsel did not act as a second prosecutor inasmuch as the testimony elicited during cross-examination of certain witnesses did not reveal any new information that was not already

> provided on direct examination of such witnesses.  Also, the opening and closing
> statements by [Palmer's] counsel did not expressly place any blame on [Murray] but,
> instead, emphasized the lack of direct evidence pointing to [Palmer's] guilt.  Although
> [Murray] correctly notes that [Palmer] would not be bound by County Court's *Sandoval*
> ruling, given that [Muray] and [Palmer] were charged with similar crimes and the People
> used the same evidence against them, such fact does not compel separate trials.  Indeed,
> "[w]here the proof against both defendants is supplied to a great extent by the same
> evidence, only the most cogent reasons warrant a severance."  In the absence of such
> cogent reasons and taking into account the strong public policy in favor of joint trials, we
> cannot say that County Court abused its discretion in denying [Murray's] motion
> for a    separate trial.

*Murray*, 64 N.Y.S.3d at 161-62.

As an initial matter, to the extent that Murray's claim is grounded on an alleged violation

of state law, such claim is not cognizable on federal habeas review.  New York Criminal

Procedure Law ("CPL") § 200.20(2)(a) and (b) permits joinder of offenses where they are based

on the same act or upon the same criminal transaction or based on different criminal transactions

when "such offenses, or the criminal transactions underlying them, are of such nature that either

proof of the first offense would be material and admissible as evidence in chief upon a trial of

the second, or proof of the second would be material and admissible as evidence in chief upon a

trial of the first."  Likewise, two or more defendants may be jointly charged under CPL §

200.40(b) and (c) where the offenses are based on a common scheme or plan or the offenses

charged are based upon the same criminal transaction.  To the extent that Murray is attempting to

renew his contentions made on direct appeal that the county court violated CPL §§ 200.20 and

200.40, such claim fails to raise an issue of constitutional dimension and must be denied on that

basis.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state

court's interpretation of state law, including one announced on direct appeal of the challenged

conviction, binds a federal court sitting in habeas corpus.").

And to the extent that Murray's claim does implicate federal constitutional concerns, such claim is without merit.  "It is within the sound discretion of the trial judge as to whether the defendants should be tried together or severally," *Opper v. United States*, 348 U.S. 84, 95 (1954), and it has been noted that "consolidated prosecutions [of multiple defendants] 'conserve funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial,'" *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993) (citation omitted).  Thus, a defendant who claims that he should have been tried separately "must show that he was so severely prejudiced by the joinder as to have been denied a fair trial." *Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990) (quotation marks omitted); *see also Opper*, 348 U.S. at 94-95 (rejecting petitioner's claim where he could point to nothing more than a "general possibility of confusion, [and] points out nothing specifically prejudicial resulting from the joint trial").  Nevertheless, a joint trial is "fundamentally unfair where the codefendants present mutually antagonistic defenses." *Grant*, 921 F.2d at 31.  The mere showing of "some antagonism" between the defendants, however, is not sufficient to warrant severance.  *Id*. (quotation marks omitted).  Instead, "separate trials are required only upon a showing that the jury, in order to believe the core of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant." *Id*. (quotation marks and alterations omitted).

Here, Murray does not show that he and Palmer presented mutually antagonistic defenses.  Rather, the prejudice he alleges is his contention that the joinder prevented him from confronting his non-testifying co-defendant about a statement the co-defendant made to law enforcement.  But as discussed more fully with respect to Claim 2, *infra*, that statement did not

inculpate Murray, and thus he cannot show that either its admission or his inability to cross-examine Palmer about the statement prejudiced him in way.

Likewise, the record also supports the Appellate Division's determination that the cross-examination by and the opening and closing statements of Palmer's counsel did not expressly lay blame on Murray or argue Murray's responsibility but rather argued that the evidence did not implicate Palmer.  As such, Palmer's defense did not necessarily convict Murray, particularly given that the case as presented by the prosecution required a finding that the two men had acted in concert.

The record further supports the Appellate Division's reasoning that the fact that Palmer was not subject to county court's *Sandoval*[7] ruling was insufficient to warrant severance. Murray's contention is that, because Palmer was not subject to the *Sandoval* ruling, if he wished to testified in his own defense, such testimony could incriminate Murray and cause him to act as a witness for the prosecution as to that incriminating testimony.  The record, however, reflects that Palmer chose not to testify.

Finally, it should be noted that the trial court expressly instructed the jury to consider each defendant's guilt or innocence separately and charged the jury to reach separate verdicts as to each different.  Under these circumstances, it was not unreasonable for the Appellate Division

---

[7]     *People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974).  *Sandoval* is a short-hand reference to the procedure under New York law under which the trial court determines, in advance, whether evidence of prior convictions is admissible in the event that the defendant testifies.  The record in this case reflects that the People sought to elicit proof of three events: 1) Murray's obtaining a gun after he learned of his girlfriend's rape and asking for more ammunition after the Scott homicide; 2) his firing of several shots near two men who he suspected were involved in the rape two days before the Scott homicide; and 3) his transporting heroin that was later found in Palmer's car.

to conclude that any potential prejudice to Murray by the joint trial was fully mitigated by the instructions.  Accordingly, Murray is not entitled to relief on this claim.

Ground 2.      _Bruton_ Error

Murray next relatedly argues that the admission at their joint trial of the redacted video recording of Palmer's police interview violated Murray's rights to due process and to confront a non-testifying witness.  Specifically, he argues that his rights were violated under *Bruton v. United States*, 391 U.S. 123 (1968), in which the Supreme Court found that the admission of a confession implicating a co-defendant in joint trial constituted prejudicial error even under circumstances in which trial court gave clear jury instruction that the confession could only be used against confessing defendant and must be disregarded with respect to the co-defendant.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  This rule applies with equal force to statements by a non-testifying accomplice or co-participant.  *See Bruton*, 391 U.S. at 135-36 (holding that the admission of a statement of an accomplice or co-participant that implicates a defendant violates the defendant's Sixth Amendment rights when the defendant has no opportunity to cross-examine the co-participant).  Where, however, the accomplice's statement does not directly implicate the defendant—i.e., the statement is "not incriminating on its face, and [becomes] so only when linked with other evidence introduced

10

later at trial"—the Constitution does not prohibit the introduction of the statement. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *see also United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978).

In this case, the Appellate Division reasonably concluded that there was no *Crawford* or *Bruton* violation because, "[d]uring [the] interview, Murray was not named by [Palmer], nor was he otherwise implicated in any wrongdoing by [Palmer's] statements." *Murray*, 64 N.Y.S.3d at 161. This Court's independent review of the redacted videotaped interview supports the Appellate Division's conclusion. Thus, the statement did not inculpate Murray on its face, and Murray cannot prevail on this claim.

Ground 3.      Reverse-*Batson* Claim

Murray additionally argues that the trial court erred when it ruled that defense counsel purposefully discriminated against male jurors. In *Batson*, the Supreme Court held that the Equal Protection Clause prohibits purposeful racial discrimination in the selection of the venire, and that prosecutors may not exercise peremptory challenges to strike prospective jurors based on their race.[8] 476 U.S. at 79, 86. In subsequent cases, the Court reaffirmed this statement and extended its application beyond race:

---

[8]      *Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (citations omitted).

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceeding. The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B. v. Alabama*, 511 U.S. 127, 140 (1994) (citation omitted).

While *Batson* motions are typically made to question the peremptory challenges lodged by the prosecution, the *Batson* framework is also applicable to claims that the defense has made improper peremptory challenges. An accusation that defense counsel has exercised discriminatorily-motivated peremptory challenges is "known as a 'reverse-*Batson*' challenge." *United States v. Thompson*, 528 F.3d 110, 115 (2d Cir. 2008). Although *Batson* and its progeny initially sought to protect a defendant's equal protection rights, the elaboration of *Batson* to include reverse challenges was founded upon the Supreme Court's recognition that: 1) jury selection implicates the equal protection rights of jurors as well as defendants; 2) a defendant assumes the role of state actor for Equal Protection purposes when making a peremptory challenge; 3) the state's standing to enforce the equal protection rights of potential jurors enables the prosecution to raise a *Batson* object to a defendant's peremptory challenge; and 4) a criminal defendant's rights to effective assistance of counsel and an impartial jury do not eliminate a potential juror's right to equal protection. *See Georgia v. McCollum*, 505 U.S. 42, 48-49, 52, 56-58 (1992).

On direct appeal, the Appellate Division laid out the following facts underlying this claim:

> During jury selection, the People objected to [Murray's] peremptory challenge with respect to juror No. 5 on the basis that he was the "eighth straight male that the

defense has excused for a peremptory."  County Court noted that juror No. 5 was the "eighth male that [Murray has] challenged peremptorily" and requested a gender-neutral reason.  Defense counsel responded that his challenge of juror No. 5 was based on his conservative background and "his dealing with Plug Power and that type of corporation, when he hears expert testimony, that he would automatically side for testimony regarding forensic, regarding DNA, regarding a lab in general."  [Palmer's] counsel added that juror No. 5's "[b]ody language was extremely troubling.  He appeared to be shaking his head."[FN3]  With respect to juror No. 17, [Palmer's] counsel had "concerns about his experience in Greene County that he spoke about, [f]ederal [g]overnment employee" and explained that "he appears to fit the profile of a conservative-prosecution vote."  The People responded that [Palmer] has "agreed to keep one male out of 11" and that it was "disproportionate with the males."  In granting the People's *Batson* objection, County Court stated, "I believe that [Murray is] excluding males and . . . [has] shown a pattern."

> FN3.   [Murray and Palmer] were required to agree on their use of peremptory challenges.

*Murray*, 64 N.Y.S.3d at 162 (citations omitted).

The thrust of Murray's claim is that he was denied his right to freely exercise his peremptory challenges.  But "peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state-created means to the constitutional end of an impartial jury and a fair trial."  *Georgia v. McCollum*, 505 U.S. 42, 57 (1992).  Accordingly, to the extent that Murray had the right to freely exercise his peremptory challenges, "it arose out of New York state law, not the federal constitution," and any claim that he was deprived of this state right is not cognizable on federal habeas review.  *Chu v. Artus*, No. 07 CV 6684, 2011 WL 8202381, at *18 (S.D.N.Y. Aug. 9, 2011); *see Brown v. Conway*, 483 F. App'x 593, 594 (2d Cir. 2012) (trial court's rejection of petitioner's peremptory challenge did not deprive him of a fair trial because there is no federal constitutional right to peremptory challenges).

It is true, however, that the Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *see Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).  Here, however, Murray has not

presented evidence that the individuals who were subsequently seated on the jury were anything but impartial.

What is more concerning, however, is whether the state trial court properly employed the *Batson* process.  The Appellate Division agreed that Murray satisfied the second step of the *Batson* analysis by providing gender-neutral reasons for his peremptory challenges on juror Nos. 5 and 17, but stated that "it appears that County Court effectively compressed steps two and three of the *Batson* test."  *Murray*, 64 N.Y.S.3d at 163.  The appellate court nonetheless concluded that "the [trial] court's consideration of pretext [the third step] can be inferred from the record."  *Id.*

In *Purkett v. Elem*, the Supreme Court found that a peremptory challenge based on a juror's long, unkempt hair, mustache, and beard satisfied the prosecution's burden of articulating a nondiscriminatory reason for the challenge.  514 U.S. 765, 768 (1995).  In reversing the Eighth Circuit's decision that the proffered reasons were insufficient for striking the potential juror, the Supreme Court reasoned that the prosecutor's explanation for striking the juror were not particular to his ethnic group and thus sufficiently nondiscriminatory.  In so finding, the Supreme Court reasoned that:

> "The [Missouri] Court of Appeals erred by combining *Batson's* second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive. . . .  It is not until the third step that the persuasiveness of the justification becomes relevant . . . . . At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.  But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step three is quite different from saying that a trial judge must terminate the inquiry at step two."

*Id.*

The Court has stressed that, throughout the *Batson* process, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. The Court concluded that the *Purkett* trial court's termination of the *Batson* test at the second step improperly shifted the burden of persuasion regarding racial motivation away from the opponent of the challenge. This begs the question here whether the county court: 1) impermissibly terminated the *Batson* inquiry at the second step, thus improperly shifting the burden of persuasion to Murray in contravention of *Purkett*; or 2) considered pretext and ruled that Murray's race-neutral explanation was mere pretext for gender discrimination, as the Appellate Division concluded, in line with the third step of a proper *Batson* analysis.

When ruling on a *Batson* challenge at the third step, a trial court must make clear "whether it credits the non-moving party's race-neutral explanation for striking the relevant panelist." *Dolphy v. Mantello*, 552 F.3d 236, 239 (2d Cir. 2009) (internal quotation omitted); *United States v. Thomas*, 320 F.3d 315, 320 (2d Cir. 2003); *Galarza v. Keane*, 252 F.3d 630, 636 (2d Cir.2001). Where the trial judge engages in only a perfunctory *Batson* inquiry and does not conduct a meaningful inquiry into the question of discrimination, the letter and spirit of *Batson* have been violated and habeas is appropriately granted. *Jordan v. Lefevre*, 206 F.3d 196, 201-02 (2d Cir. 2000) (holding that trial court's "perfunctory exercise designed to speed the proceedings along" that did not allow for defense counsel to argue that a proffered race-neutral reason was pretextual "did not constitute a meaningful inquiry into the question of discrimination"). The trial court need not, however, "engage in a talismanic recitation of specific words in order to satisfy *Batson*" so long as it generally credits the non-moving party's neutral explanation. *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006); *Reyes v. Greiner*, 340 F. Supp. 2d 245,

253 n.1 (E.D.N.Y.2004).  "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Messiah*, 435 F.3d at 198.

The problem in this case, of course, is that the county court's statements finding "no gender-neutral reason" as to the two challenged jurors that were eventually seated, which the Appellate Division characterized as "compress[ing] steps two and three of the *Batson* test," *Murray*, 64 N.Y.S.3d at 163, could be interpreted as a fundamental misunderstanding of the minimal explanation required at the second step of the *Batson* analysis.  The record shows that the prosecution asserted a *Batson* challenge initially on the fact that Murray and Palmer had struck eight men in a row, and by the end of the inquiry, had moved to strike two additional men. The pattern of strikes appears to have satisfied the first step of *Batson*, a *prima facie* showing of discrimination.  Defense counsel then presented their reasons for striking each of the three jurors challenges, as required at *Batson* step two.  With respect to juror number 5, defense counsel argued that he had a conservative background, that he worked for a corporation, and that he was shaking his head.  As to juror number 19, defense counsel pointed to his work with the Division of Parole and his court-martial experience.  Finally, defense counsel stated as to juror number 17 that "he appears to fit the profile of a conservative-prosecution vote and I have concerns about his experience in Greene County that he spoke about, Federal Government employee."

After the defense proffered those reasons, the prosecutor again reiterated, "It's disproportionate with the males, 10 out of 11.  They have agreed to keep one male out of 11.  It's less than 10 percent."  The defense rebutted that there was "an equal number of women and men

on the panel," and the prosecutor again stated, "I think there's a disproportionate number of them."  The court then stated, "I believe that you are excluding males and you have shown a pattern.  I see no gender-neutral reason for 5 and 17.  I do see a gender-neutral reason for 19, and I'm going to allow the People's challenge as to 5 and 17."

But as the Appellate Division noted, Murray satisfied the second step of *Batson* by providing gender-neutral reasons for the peremptory challenges of jurors 5 and 17.  The proffered reasons have long been accepted as neutral justifications under *Batson* analyses.  *See Jordan*, 206 F.3d at 200 (explaining that type of employment and demeanor have been found to be acceptable neutral bases for peremptory challenges).  Notwithstanding the trial court's unfortunate comment to the contrary that he found "no gender-neutral reason" as to jurors 5 and 17, in light of this Court's deferential review of fact and credibility determinations and based on an independent review of the voir dire transcript, the Court does not find unreasonable the Appellate Division's determination that the trial court considered pretext as required under the third *Batson* step and ultimately determined that the proffered reasons were mere pretext.  Although the trial court's handling of the *Batson* inquiry is certainly troubling, the Appellate Division could reasonably infer from the transcript of the proceedings that the trial court simply did not believe that the proffered reasons were the defense's true reason for dismissing the jurors.[9]

---

[9]      Further complicating matters is that it is not clear whether a finding of *Batson* error would be subject to harmless error review.  The Second Circuit Court of Appeals has held that a successful ordinary *Batson* claim "is a structural error that is not subject to harmless error review."  *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998) (citing *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir. 1995)).  More recently, however, the U.S. Supreme Court has indicated that *Batson* claims may be subject to harmless error analysis.  *See Davis v. Ayala*, 576 U.S. 257, 270 (2015) (holding that the Ninth Circuit failed to give enough deference to the state

The Seventh Circuit's decision in *Aki-Khuam v. Davis*, 339 F.3d 521, 529 (7th Cir. 2003) does not compel a contrary conclusion.  In that case, the Seventh Circuit Court of Appeals affirmed the grant of habeas where the state trial court *sua sponte* invoked *Batson* to preclude a petitioner from exercising his peremptory challenges, reasoning that the trial court's *Batson* process improperly converted all of the defense's peremptory challenges to challenges for cause and was thus contrary to *Purkett*.  *Aki-Khuam*, 339 F.3d at 529 n.6.[10]  But "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'  It therefore cannot form the basis for habeas relief under AEDPA."  *See Parker v. Matthews*, 132

---

court's determination that a *Batson*-related error was harmless insofar as the petitioner could not prove that he suffered actual prejudice); *see also Carmichael v. Chappius*, 340 F. Supp. 3d 340, 348 (S.D.N.Y. 2018) (calling *Tankleff* into doubt in light of *Ayala*); *but see Smith v. Schneiderman*, No. 13 Civ. 8423, 2017 WL 3917606, at n.7 (stating that a *Batson* error is a structural error despite the use of harmless error analysis in *Ayala*).  To the extent that any error committed by the trial court in the reverse-*Batson* context may be subject to harmless error review, which does not appear to have been squarely addressed by the Second Circuit or the U.S. Supreme Court, the Court concludes that, in light of the overwhelming evidence against Murray and the lack of showing that the two seated jurors were not impartial, any reverse-*Batson* error at Murray's trial was harmless.

[10]     The Seventh Circuit explained:

> We are careful to note that today's decision is strictly limited to the issues raised on appeal by the parties, and should not be read to hold that (i) the Constitution provides a per se right to peremptory challenges, (ii) the Constitution per se requires states to adhere to their own rules of trial procedure, or (iii) the harmless-error doctrine is inapplicable.  Here, the elimination of Petitioner's state-constitutionally guaranteed right to peremptory challenges resulted in their conversion to challenges for cause, which the trial judge then denied not explicitly because they appeared to be racially motivated, but rather because he was generally dissatisfied with Petitioner's stated reasons for challenging (such as the lack of a record showing that a potential juror could not give Petitioner a presumption of innocence, or the absence from the record of a "good reason" for striking a potential juror).  The resulting denial of Petitioner's equal protection and due process rights was not harmless.

*Aki-Khuam*, 339 F.3d at 529 n.6.

S. Ct. 2148, 2155 (2012) (citation omitted).  Moreover, although the Appellate Division here

recognized that the trial court "effectively compressed steps two and three of the *Batson* test,"

the Appellate Division nonetheless reasonably concluded that, unlike in *Aki-Khuam*,[11] "the

court's consideration of pretext can be inferred from the record."  *Murray*, 64 N.Y.S.3d at 163.

Murray is therefore not entitled to relief on his reverse-*Batson* claim.

Ground 4.    <u>Prosecutorial Misconduct</u>

Finally, Murray contends that the prosecution committed misconduct by making

improper remarks on summation.  Federal habeas review of prosecutorial misconduct claims is

limited to the narrow issue of whether the alleged misconduct violated due process.  *See Darden*

*v. Wainwright*, 477 U.S. 168, 181 (1986).  A habeas petition will be granted for prosecutorial

misconduct only when the misconduct "so infected the trial with unfairness as to make the

resulting conviction a denial of due process."  *Id.* at 171 (quoting *Donnelly v. DeChristoforo*,

416 U.S. 637, 643 (1974)).  To constitute a due process violation, the prosecutorial misconduct

must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

*Greer v. Miller*, 485 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667

(1985)).  Under this standard, a petitioner must show there is a reasonable probability the error

---

[11]    It is also worth noting that the petitioner in *Aki-Khuam* was sentenced to death. Courts often impose stricter scrutiny of errors in capital cases than in noncapital ones.  *See Glossip v. Gross*, 576 U.S. 863, 135 S. Ct. 2726, 2771 (Breyer, J., dissenting) ("[I]t is difficult for judges, as it would be difficult for anyone, *not* to apply legal requirements punctiliously when the consequence of failing to do so may well be death, particularly the death of an innocent person."); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) ("[O]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case" (internal quotation marks omitted)).  Likewise, in *Aki-Khuam* the court was particularly troubled that the trial court *sua sponte* questioned the defense's use of peremptory challenges without an initial complaint by the prosecution.  *Aki-Khuam*, 339 F.3d at 527.

complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different.

Murray challenges: 1) the prosecutor's remarks about accessorial liability on the ground that the prosecutor omitted the requirement that the accessory act with the state of mind required for the commission of the crimes; and 2) the prosecutor's remark with respect to conspiracy on the ground that the prosecutor inaccurately stated that the agreement to commit a crime need not be formal or even verbal.  But neither of these challenges are supported by the record, which reflects that the prosecutor indirectly mentioned the state-of-mind requirement of accessorial liability and accurately summarized New York law on conspiracy.  In any event, the jury was correctly instructed on the law, and the jury is presumed to obey the court's instructions.  *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) ("juries are presumed to follow their instructions") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Whitten*, 610 F.3d 168, 191 (2d Cir. 2010) ("We presume that juries follow instructions."); *United States v. Sabhnani*, 599 F.3d 215, 240 (2d Cir. 2010).  Accordingly, Murray's prosecutorial misconduct claim fails.

## V. CONCLUSION

Murray is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability solely with respect to his claim that the trial court erred when it ruled that defense counsel purposefully discriminated against male jurors (the reverse-*Batson* claim in Ground 3). 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Court of Appeals. *See* FED. R. APP. P. 22(b); 2D CIR. R. 22.1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 19, 2020.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge